COURT OF APPEALS OF VIRGINIA

Present:  Judges Bumgardner, Frank and Humphreys
Argued at Richmond, Virginia


JESSIE LAMONT TATE, S/K/A
 JESSE TATE

MEMORANDUM OPINION[*] BY
v.    Record No. 1860-99-2          JUDGE ROBERT P. FRANK
                                      OCTOBER 10, 2000
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                      Thomas N. Nance, Judge

            S. Jane Chittom, Appellate Counsel (Public
            Defender Commission, on briefs), for
            appellant.

            Donald E. Jeffrey, III, Assistant Attorney
            General (Mark L. Earley, Attorney General, on
            brief), for appellee.


     Jessie Lamont Tate (appellant) was convicted in a bench trial

of possession with intent to distribute cocaine in violation of

Code § 18.2-248.  On appeal, he contends the trial court erred in

denying his motion to suppress the cocaine found in his mouth,

asserting that the search of his mouth exceeded the scope of his

consent.  For the reasons stated, we affirm the conviction.

                        I.  BACKGROUND

     Officer Scott Shapiro of the Richmond Police Department

received information from a "reliable informant" that Clifford

_____

        * Pursuant to Code § 17.1-413, recodifying Code
§ 17-116.010, this opinion is not designated for publication.

Brunson was in possession of cocaine in a gold Volvo automobile, which was parked outside a delicatessen on Meadowbridge Road. The informant, by telephone, told Shapiro he had "just seen" Brunson with cocaine. The informant did not tell Shapiro whether Brunson was armed. Within "two to three minutes," Shapiro and Officer Bohannon arrived at the location and observed a Volvo, which matched the description, "going down the street." The officers stopped the vehicle. Brunson, with whom Shapiro was familiar, was seated in the driver's seat, and appellant was the only passenger in the vehicle.

Shapiro testified that past information he received from the same informant had "led to search warrants, numerous arrests and convictions in the Circuit Court of Richmond."

The officers patted down Brunson for weapons. They did not discover any weapons during the pat-down, and there were no weapons in the vehicle in "plain view." Officers McQuail and Boyett arrived while Shapiro was talking to Brunson. Brunson gave the officers permission to search him, and Shapiro took Brunson behind a building and made a thorough search.

Officer Steven McQuail stated he looked inside the vehicle and observed appellant "breathing hard" and "moving around the vehicle." McQuail also stated appellant "looked anxious." McQuail testified appellant "had been coughing," "threw a cigarette out," and "opened the door and spit out of the car."

-

McQuail said Officer Boyett asked appellant why he was "so nervous."

McQuail testified he asked appellant to "step out of the vehicle." He made the request because "of the information from Officer Shapiro" regarding the possibility of drugs in the vehicle and because he was uncomfortable in the location because it was a "high drug trafficking area." McQuail testified he was worried about his safety because appellant was nervous and "drugs are associated with weapons."

McQuail stated he then asked appellant if he could "search his person." Appellant responded affirmatively and raised his arms. McQuail immediately patted down appellant for weapons because of the safety concerns, but did not locate any weapons. McQuail asked appellant to step to the rear of the vehicle so he could "conduct a search."

The officer noticed a bulge in appellant's left jacket pocket but it did not feel like a weapon. McQuail proceeded to search appellant's person and then noticed appellant's right cheek was "extended outward as if something was inside his mouth." McQuail pressed against appellant's cheek and "asked him to open his mouth." As appellant did so, his tongue appeared to be "covering something" because it was "raised up from the bottom of his mouth." McQuail asked him to "raise his tongue." Appellant "manipulated his mouth and it appeared as though he was trying to shuffle something in his mouth."

During this process, McQuail observed "a white object which [he] believed to be [crack] cocaine" based on his training and experience. McQuail retrieved the object, placed appellant under arrest, handcuffed him, continued the search, and advised appellant of his Miranda rights. In a search incident to the arrest, McQuail located a large amount of cash in appellant's left jacket pocket.

McQuail then took appellant behind a building to conduct a more thorough search, specifically of the groin area. McQuail did not complete the search because the area was too public. He took appellant to the police station where appellant was re-advised of his Miranda rights. Appellant also signed a written waiver of his Miranda rights. Appellant admitted he had more drugs on his person. McQuail began to search appellant but was unable to find additional contraband. Then, Boyett found a bag, appearing to contain cocaine, concealed in appellant's groin area.

During cross-examination, McQuail admitted he allayed any concerns he had about weapons on appellant's person by doing the pat-down. He stated he also asked appellant to exit the vehicle because of the possibility of drugs on his person. He stated he intended to investigate further based on appellant's consent as well as the information related to illegal drugs. He further said he had repeatedly asked appellant to open his mouth.

On re-direct examination, McQuail said that from the time he asked appellant if he could search him until the time he located

-

the suspected cocaine, appellant never asked him to "stop searching" or gave any indication that he wanted him to do so. He said he asked appellant to open his mouth after seeing the bulge because he had "found drugs in people's mouths before." McQuail said he knew the mouth is a "common place to hold drugs."

The trial court denied the motion to suppress. Appellant pled guilty to the offense, reserving the search and seizure issue.

## II.  ANALYSIS

On review of a trial court's denial of a suppression motion, "we view the evidence in a light most favorable to . . . the prevailing party below, and we grant all reasonable inferences fairly deducible from that evidence." Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991) (citing Commonwealth v. Holloway, 9 Va. App. 11, 20, 384 S.E.2d 99, 104 (1989)).  In our review, "we are bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." McGee v. Commonwealth, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (en banc) (citation omitted). However, we consider de novo whether those facts implicate the Fourth Amendment and, if so, whether the officers unlawfully infringed upon an area protected by the Fourth Amendment.  See id.

-

"[T]he fourth amendment proscribes all unreasonable searches and seizures and '"searches conducted outside the judicial process, without prior approval of a judge or magistrate, are per se unreasonable under the Fourth Amendment--subject only to a few specifically established and well-delineated exceptions."'" Cantrell v. Commonwealth, 7 Va. App. 269, 282, 373 S.E.2d 328, 334 (1988) (citations omitted).  However, searches made by the police with the consent of a person authorized to give consent "do not implicate the fourth amendment."  Iglesias v. Commonwealth, 7 Va. App. 93, 99, 372 S.E.2d 170, 173 (1988).  Once consent is given, the search remains lawful:  1) as long as the consenting individual does not withdraw the consent and 2) if the police do not exceed the scope of the consent.  See Grinton v. Commonwealth, 14 Va. App. 846, 850-51, 419 S.E.2d 860, 862-63 (1992).  "The question of whether a particular 'consent to a search was in fact voluntary or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances,'" and will not be reversed on appeal unless clearly erroneous.  Deer v. Commonwealth, 17 Va. App. 730, 735, 441 S.E.2d 33, 36 (1994) (citation omitted).  Similarly, whether the search exceeds the scope of consent is a factual matter and a trial court's findings will be upheld unless clearly erroneous.  See United States v. Pena, 920 F.2d 1509, 1514 (10th Cir. 1990) (citation omitted).  Whether the consent to search was withdrawn is a factual question to be determined from the totality

-

of the circumstances.  See United States v. Maldonado, 38 F.3d 936, 942 (7th Cir. 1994).

While conducting a consensual search, the police may lawfully seize an item that they discover in plain view if they "'have probable cause to believe that the item in question is evidence of a crime or contraband.'"  McNair v. Commonwealth, 31 Va. App. 76, 82-83, 521 S.E.2d 303, 307 (1999) (en banc) (citation omitted).

In Grinton, we held:

> A consensual search is reasonable if the search is within the scope of the consent given.  United States v. Martinez, 949 F.2d 1117, 1119 (11th Cir. 1992).  The scope of a person's consent is determined by whether it is objectively reasonable for the police to believe that the consent permitted them to search where they did.  Florida v. Jimeno, 500 U.S. 248, 251, 111 S. Ct. 1801, 1803-04, 114 L.Ed.2d 297 (1991).  It is objectively reasonable for a police officer to search a container within a car based on a general consent to search the car for narcotics and where no specific limitations are placed on the scope of the search.  Id.
>
> The scope of a search may be further defined during the course of the search by the passive acquiescence of the person whose property is being searched.  See e.g. United States v. DeWitt, 946 F.2d 1497, 1501 (10th Cir. 1991) (officer's placement of his hand in cleft between back seat cushions of car did not exceed scope of consent, where defendant did not object until after discovery of narcotics), cert. denied, 502 U.S. 1118, 112 S. Ct. 1233, 117 L.Ed.2d 467 (1992); United States v. Alfaro, 935 F.2d 64, 67 (5th Cir. 1991) (defendant fails to withdraw consent where he asks to go outside to talk to another but makes no protest).  Cf. United States v. Patacchia, 602 F.2d 218, 219 (9th Cir. 1979) (saying "I would but I

-

> can't" open car trunk, is not consent where
> prior consent not given).

Grinton, 14 Va. App. at 850-51, 419 S.E.2d at 862-63.

Appellant does not contest the voluntariness of his consent, but argues his consent only was for a pat-down for weapons. The record belies this contention. Officer McQuail asked appellant if he could "search his person." The request was not limited to a search for weapons. McQuail testified he advised appellant he was investigating the possibility of drugs. It is uncontroverted that appellant consented. Once the pat-down revealed no weapons, the officer continued with his search. Appellant knew of the drug investigation prior to the pat-down. We, therefore, reject appellant's contention that his consent was limited to a pat-down for weapons.

Appellant further contends his reluctance to open his mouth and his efforts to conceal the drugs under his tongue were evidence of his desire to withdraw his consent. We disagree.

Appellant argues Reittinger v. Commonwealth, 260 Va. 232, 532 S.E.2d 25 (2000), applies. In Reittinger, the police stopped the appellant's vehicle because it only had one operable headlight. See Reittinger, 260 Va. at 234, 532 S.E.2d at 26. The appellant showed the officer a new headlight that he stated he was planning to install the following day. See id. The officer gave the appellant a verbal warning, told the appellant he was "'free to go,'" and then asked the appellant if there were illegal weapons

-

or drugs in the van.  See id.  The appellant stated that there was nothing illegal in the van, and the officer asked for permission to search the van.  See id.  The officer repeated his request twice and the appellant appeared to be consulting with the passengers in his vehicle.  See id.  The appellant did not answer the officer and, instead, exited the van.  See id.  The officer noticed a "bulge" in the appellant's pants pocket and conducted a pat-down search.  See id.  The bulge felt hard and the officer asked the appellant to empty his pocket.  See id. The appellant removed from his pocket a smoking pipe that contained marijuana residue.  See id.  The Supreme Court of Virginia held that the appellant's encounter with the officer was not consensual under the Fourth Amendment.  See id. at 236-37, 532 S.E.2d at 27-28.  The Court noted that the circumstances of the encounter would not lead a reasonable person to believe they were free to leave.  See id.  Holding that the appellant was unlawfully seized, the Court reversed the trial court's denial of the appellant's motion to suppress the product of the search.  See id. at 237, 532 S.E.2d at 28. Appellant argues that McQuail's requests for him to open his mouth and raise his tongue are similar to the repeated requests of the officer in Reittinger.  Appellant argues that a series of requests and refusals does not imply consent.  We hold that Reittinger is not applicable to this case.  In Reittinger, the appellant never consented to the search, and, instead, merely

-

exited the van.  In this case, it is uncontested that appellant consented to a search of his person and was aware that McQuail was conducting a drug investigation.  Appellant argues that he did not consent to a search of his mouth.  However, when McQuail noticed appellant's cheek was "extended outward as if something was inside his mouth" and asked appellant to open his mouth, appellant did so.  McQuail noticed that appellant's tongue appeared to be covering something and asked appellant to raise his tongue.  Appellant then appeared to shuffle something in his mouth.  Appellant never stated that he would not open his mouth, nor did he state that he withdrew his consent to the search.  We, therefore, find that appellant did not withdraw his consent to the search but, in opening his mouth and complying with McQuail's request, specifically consented to a search of his mouth.[1]  Once McQuail observed what he believed was crack cocaine, he had probable cause to seize the object in appellant's mouth.  We, therefore, conclude appellant's "conduct thus falls far short of an unequivocal act or statement of withdrawal, something found in most withdrawal of consent cases."  Alfaro, 935 F.2d at 67 (citations omitted).  "More likely, [appellant's] hesitancy places his appeal within the ambit of United States v. Brown, 884 F.2d 1309, 1312 (9th Cir. 1989), . . . where a defendant who consented

_____

[1] We do not address whether the mouth is a body cavity under Hughes v. Commonwealth, 31 Va. App. 447, 524 S.E.2d 155 (2000) (en banc), because we find appellant consented not only to a general search but a specific search of his mouth.

-

to a search of his suitcase but then became extremely reluctant to hand over his suitcase keys was held not to have taken back his consent."  Id.  Based on the totality of the circumstances, the trial court could properly conclude appellant did not withdraw his consent.

We further find McQuail did not exceed the scope of the consent.  Based on the totality of the circumstances, we conclude appellant, by consenting to a search, agreed to a search of any place where drugs could reasonably be found.  The "failure to object to the continuation of the search under these circumstances may be considered an indication that the search was within the scope of the consent."  United States v. Espinosa, 782 F.2d 888, 892 (10th Cir. 1986).

For these reasons, we affirm the judgment of the trial court.

Affirmed.

-